# UNITED STATES DISTRICT COURT
for the
Middle District of Tennessee

| | |
|---|---|
| United States of America ) | |
| v. ) | |
| ) | Case No. 25-mj-1139 |
| Rimon Salim ) | |
| ) | |
| ) | |
| ) | |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of  December 2023 to March 2025  in the county of  Davidson  in the
 Middle  District of  Tennessee , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1) | Distriution and Possession with the Intent to Distribute Methamphetamine and Cocaine |
| 21 U.S.C. 856 | Maintianing a Drug-Involved Premises |

This criminal complaint is based on these facts:

See attached six-page statement

☑ Continued on the attached sheet.

s/ Cristina Alamo (telephonically)
*Complainant's signature*

Cristina Alamo, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 03/28/2025

*Judge's signature*

City and state:  Nashville, Tennessee

Barbara D. Holmes
*Printed name and title*

# STATEMENT IN SUPPORT OF A CRIMINAL COMPLAINT

1. Your affiant, Cristina Alamo, is a Special Agent with the Federal Bureau of Investigation (FBI) and has been since March 2022. I am currently assigned to the Nashville Field Office within the Middle District of Tennessee. I am assigned to investigate a variety of criminal matters, including criminal violations, including but not limited to, violent crimes, gangs and criminal enterprises, Hobbs Act violations, and firearms violations occurring in the Middle District of Tennessee and elsewhere. In addition, I am assigned to investigate crimes related to the distribution and possession with the intent to distribute controlled substances, and the conspiracy to do so, in violation of Title 21, United States Code, Sections 841 and 846; maintaining a drug-involved premises, in violation of Title 21, United States Code, Section 856; and laundering of monetary instruments and engaging in monetary transactions involving property derived from specified unlawful activity, in violation of Title 18, United States Code, Sections 1956 and 1957.

2. Based on the facts set forth in this statement, there is probable cause to believe that Rimon Salim Ranzi ("**SALIM**") has distributed and possessed with the intent to distribute methamphetamine and cocaine, in violation of Title 21, United States Code, Section 841(a)(1); and maintained a drug-involved premises, in violation of Title 21, United States Code, Section 856 ("the Target Offenses").

3. The facts in this statement come from my personal observations, my training and experience, and information obtained from other agents and witnesses. In addition to this information, I have also utilized two Confidential Human Sources (CHS) to develop information about **SALIM** and the Target Offenses. CHS-1 is cooperating with law enforcement in exchange for funds and employment authorization. CHS-1 has repeatedly supplied law enforcement with reliable information about **SALIM** and the Target Offenses. In addition to CHS-1, CHS-2 is also

cooperating with law enforcement in exchange for funds and employment authorization. CHS-2 has repeatedly supplied law enforcement with reliable information about **SALIM** and the Target Offenses.

4. This statement is intended to merely show that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

5. For approximately 18 months, local, state, and federal law enforcement agencies have been investigating ongoing criminal activity at two nightclubs in Nashville, Tennessee – (i) Paisanos Bar and Billar ("Paisanos"), and (ii) Miami Club (hereafter collectively referred to as "the Clubs"). According to records from the Tennessee Secretary of State, **SALIM** is the owner of Miami Dance Hall, LLC. This entity owns the Clubs.

6. On or about December 16, 2023, male and female undercover agents conducted an internal inspection of the Clubs. The agents separately went into the respective male and female bathrooms of both clubs. In Paisanos' male bathroom, there were two men. One man was standing inside of a partially opened stall. He had something in his hand and was not using the toilet. The other man was standing outside of this stall and appeared to be waiting for something. The agent used a urinal and exited the bathroom, but the two men remained in the bathroom. A short time later, the man who was standing outside the stall exited the bathroom, but the man inside of the stall remained in the bathroom. When the female agent went in the female bathroom in Paisanos, there was a woman inside the stalls allowing others to enter. The agent saw two women take turns going in a stall and heard them sniffing something while in the stall. Based on these sounds and the agent's experience, the agent believed the two females were using controlled substances.

7. When Paisanos closed on or about December 16, 2023, the male and female undercover agents went next door to Miami Club and went into the bathrooms. In the male bathroom, the male agent partially saw the head of a man in a stall and heard the man snorting something. Based on this sound and the agent's experience, the agent believed the man was using a controlled substance. The female agent went in the female bathroom, but did not see or hear anything that could be perceived as drug usage.

8. In addition to the observations by FBI agents, Agents have also used CHS-1 and CHS-2 to conduct controlled purchases of cocaine from men in the Clubs' bathrooms. Prior to these purchases, CHS-1 and CHS-2 were searched by Agents for money and contraband. Once the search was completed, CHS-1 and/or CHS-2 were provided recording devices and funds to conduct controlled purchases at the Clubs. CHS-1 and CHS-2 have told Agents that when they purchase drugs, the cocaine in the Clubs' bathrooms, the cocaine was pre-packaged individually and ready to be sold.

9. On or about February 25, 2024, CHS-1 purchased a user amount of cocaine for $100 from a man inside of the Paisanos men's bathroom. The man who sold the cocaine identified himself by name and provided CHS-1 with his number, if CHS-1 wanted to purchase more drugs outside of the nightclub.

10. When Paisanos closed around 2:30 a.m., CHS-1 went next door to Miami Club and purchased more cocaine. Precisely, CHS-1 purchased a user amount of cocaine for $100 from an individual inside of the men's bathroom. This individual provided CHS-1 with his name and cell phone number, if CHS-1 wanted to purchase more drugs. After these transactions, CHS-1 returned the cocaine that CHS-1 purchased to awaiting Agents. The Drug Enforcement Administration

(DEA) drug lab examined the purchased cocaine and determined the two baggies contained cocaine hydrochloride and with weights of 0.32 grams and 0.32 grams.

11. On or about February 23, 2025, CHS-1 purchased a user amount of cocaine inside of the Paisanos men's bathroom for $100 from the same man who sold CHS-1 cocaine on or about February 24, 2024. Shortly thereafter, CHS-2 also purchased a user amount of cocaine inside the Paisanos men's bathroom for $20 from the same man who sold CHS-1 cocaine. Later in the morning, CHS-2 received a free baggie of cocaine inside of the Miami Club men's bathroom while Co-Conspirator 2, another unidentified man, and **SALIM** were present. CHS-1 and CHS-2 then returned the cocaine that they received from the Clubs to awaiting Agents. The DEA drug lab examined the purchased cocaine and determined the three baggies contained cocaine hydrochloride. One baggie weighed 0.17 grams, and the two other baggies had a combined weight of 0.19 grams.

12. On March 9, 2025, CHS-2 purchased a user amount of cocaine for $40 from a man inside of the Paisanos' male bathroom. When Paisanos closed around 2:30 a.m., CHS-2 went next door to Miami Club and purchased more cocaine. Specifically, CHS-2 purchased a user amount of cocaine from Co-Conspirator 2 for a total of $100. CHS-2 also received a free baggie of cocaine. Thereafter, CHS-2 returned the cocaine to awaiting Agents. The cocaine presumptively tested positive for cocaine and weighed approximately three grams.

13. In addition to the cocaine sales inside of the Clubs' bathrooms, CHS-2 has purchased methamphetamine from **SALIM** at the Clubs on multiple occasions. During August 2024, CHS-2 and **SALIM** exchanged text messages in which **SALIM** discussed a drug transaction. On a call, **SALIM** agreed to sell CHS-2 methamphetamine for $400 at the Clubs on August 29, 2024.

14. Prior to the controlled buy on August 29, 2024, Agents monitored **SALIM**. They saw him leave his residence around 3:30 p.m., drive to the Clubs, and meet CHS-2. **SALIM** proceeded to unlock Miami Club and sell the methamphetamine to CHS-2. Once **SALIM** sold CHS-2 the methamphetamine, CHS-2 returned to awaiting Agents and provided them with this substance. The DEA drug lab examined the purchased substance and determined it was 99 percent pure methamphetamine with a net weight of 56.86 grams. While some Agents followed CHS-2 to their meeting location, other Agents followed **SALIM** from the Clubs back to his residence.

15. On October 29, 2024, Agents attempted to utilize CHS-2 to purchase six ounces of methamphetamine from **SALIM**. CHS-2 and **SALIM** discussed prices and methamphetamine suppliers. **SALIM** offered to sell CHS-2 four ounces of methamphetamine for $300 per ounce. This price was higher than the previous transaction. **SALIM** explained the increase was because he had obtained a new source of supply. Due to the price increase, Agents decided not to conduct a transaction with **SALIM** using CHS-2.

16. In the early morning hours of February 23, 2025, Agents conducted a controlled purchase from Miami Club. Specifically, CHS-1 and CHS-2 met **SALIM** in Miami Club. Eventually, CHS-2 went into the bathroom with **SALIM** for CHS-2 to get drugs from someone in the bathroom. CHS-2 received a small free bag of cocaine from an unidentified man and Co-Conspirator 2 in the bathroom while **SALIM** was present. **SALIM** asked Co-Conspirator 2 and the unidentified man if they had any bigger quantities to give to CHS-2 because CHS-2 was **SALIM's** friend. They responded that they did not have bigger quantities to give CHS-2.

17. In response, **SALIM** told CHS-2 he would get someone else to supply CHS-2 with drugs. **SALIM** then used a cellular telephone to contact Co-Conspirator 1 by calling Co-Conspirator 1 and asking Co-Conspirator 1 to bring the methamphetamine to Miami Club. About

fifty minutes later, Co-Conspirator 1 arrived and provided CHS-2 with the methamphetamine. **SALIM**, however, took $600 in cash from CHS-2 for this transaction. During the transaction, Co-Conspirator 1 referred to **SALIM** as his "boss." Co-Conspirator 1 also told CHS-2 that if he needed more drugs, he could call Co-Conspirator 1 on his phone.

18. CHS-1 and CHS-2 departed Miami Club and returned the purchased methamphetamine to awaiting Agents. The DEA drug lab examined the purchased methamphetamine and determined it was 94 percent pure with a weight of 27.69 grams.

19. On March 9, 2025, CHS-2 purchased cocaine from **SALIM** for $1,800 at Miami Club. Specifically, CHS-2 met **SALIM** in the exterior parking lot area of Miami Club and asked **SALIM** for cocaine. **SALIM** discussed the price with CHS-2. **SALIM** then called an unidentified person and ordered the cocaine. CHS-2 provided the money to **SALIM** and waited inside Miami Club for the cocaine to arrive. When the cocaine arrived, **SALIM** met CHS-2 inside Miami Club. They went into the club's restroom, weighed the cocaine, and **SALIM** gave the cocaine to CHS-2. Co-Conspirator 1 and Co-Conspirator 2 were also inside the restroom during this transaction. Thereafter, CHS-2 returned the cocaine to awaiting Agents. The DEA drug lab examined the purchased suspected cocaine and determined it was cocaine with a weight of 55 grams.

20. Cocaine and methamphetamine are Schedule II controlled substances.

21. All of the events above occurred in the Middle District of Tennessee.

## Conclusion

22. Based on the facts listed above, there is probable cause to believe that between on or about December 2023, until on or about March 2025, **SALIM** maintained a drug involved premises, in violation of Title 21, United States Code, Section 856; and distributed and possessed

with the intent to distribute methamphetamine and cocaine, in violation of Title 21, United States Code, Section 841(a)(1).